1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ANTHONY E. MACK,                              No.  2:05-CV-2134-MCE-DMC-P

12              Plaintiff,

13        v.                                        <u>FINDINGS AND RECCOMMENDATIONS</u>

14   NEIL HIRSCH, et al.,

15              Defendants.

16

17              Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to

18   42 U.S.C. § 1983.  Pending before the court are separate motions for summary judgment filed by

19   defendant Penner (Doc. 155) and defendants Hirsch, Turella, Kordan, Baughman, and O'Brien

20   (Doc. 168).  Also before the court is plaintiff's motion for injunctive relief (Doc. 223).

21              Plaintiff claims defendants were deliberately indifferent to his serious medical

22   needs, in violation of the Eighth Amendment.  For the reasons discussed below, the court finds

23   defendants are entitled to judgment in their favor as a matter of law on plaintiff's Eighth

24   Amendment claims, defendant Hill should be dismissed for failure to effect service of process,

25   and plaintiff's motion for injunctive relief should be denied.

26   / / /

27   / / /

28   / / /

# I. PLAINTIFF'S ALLEGATIONS

This action proceeds on plaintiff's verified first amended complaint against defendants Hirsch, Turella, Kordan, Baughman, O'Brien, and Penner (Doc. 24).[1] Plaintiff claims he injured his shoulder during a prison altercation with other inmates on January 15, 1999. According to plaintiff: defendants were deliberately indifferent to the severity of his injury; due to the defendants' deliberate indifference necessary medical care was delayed; and the delay resulted in further injury to his shoulder. Plaintiff alleges he received inadequate medical care from prison medical providers, including delayed medical treatment, defective treatment, deliberate misdiagnoses, and deliberate misreading of misread x-rays.[2]

## Allegations Specific to Defendants Kordan and Baughman

Plaintiff states he arrived at the California Correctional Institute – Tehachapi (CCI) on May 14, 2001. See Doc. 24, pg. 10. According to plaintiff:

> Several months (7) passed before Plaintiff could convince Doctor Baughman and Bernard Kordan . . . on separate occasions that additional testing should follow due to the level of discomfort and because the injury was obvious to the untrained or competent eye who were familiar with physical symmetry in general.

Id.

/ / /

---

[1]     The first amended complaint names the following as defendants: (1) Marsha Ona; (2) A. Lucine; (3) N. Hirsch; (4) Elaine Hill; (5) N. Parker; (6) Monte Penner; (7) D. Thor; (8) G. Parkinson; (9) Nelson Parker; (10) J. Turella; (11) J. Krossa; (12) Bernard Kordan; (12) Baughman; (13) J. Moor; (14) I. Baroyal; (15) Salvatore A. Latteri; (16) T. Vo; (17) Ricardo Centeno; (18) Norris Hollie; (19) C.M. Hynum; and (20) C.W. O'Brien. See Doc. 24, pgs. 1-2. Defendants Hollie, Krossa, Lucine, Parkinson, Thor, Ona, Parker, Moor, and Hynum were dismissed on January 27, 2009. See Doc. 105 (January 27, 2009, District Judge order). Defendant Centeno was dismissed by stipulation on May 5, 2009. See Docs. 116 (parties' stipulation) and 118 (May 5, 2009, order). Defendant Vo was dismissed by stipulation on August 31, 2009. See Docs. 159 (parties' stipulation) and 164 (August 31, 2009, order). Defendant Boroya was dismissed by stipulation on October 20, 2009. See Doc. 169 (parties' stipulation). Defendant Laterri was dismissed on September 28, 2018, pursuant to Federal Rule of Civil Procedure 25(a)(1). See Doc. 221 (September 28, 2018, District Judge order). Defendant Hill has not been served.

[2]     On January 27, 2009, the District Judge issued an order limiting this action to claims arising after October 24, 2001. See Doc. 105 (January 27, 2009, District Judge order). The court concluded plaintiff's claims arising prior to October 24, 2001, are barred by the statute of limitations. See id. Finally, while the District Judge's order references possible state law medical negligence claims, see id., plaintiff stated at his deposition he is not raising any state law claims in this action, see Doc. 168-8, Exhibit C (transcript of plaintiff's May 1, 2009, deposition, pg. 57, lines 8-15).

Plaintiff states defendant Baughman ordered x-rays on December 28, 2001, <u>see</u> Doc. 24, pg. 10, but that the results were deliberately misread and mischaracterized by defendant Kordan, <u>see</u> <u>id.</u> Plaintiff also contends defendant Kordan misread x-rays taken on June 7, 2002. <u>See</u> <u>id.</u> at 11.

<u>Allegations Specific to Defendant Hirsch</u>

Plaintiff alleges defendant Hirsch "all during this period" refused to examine his shoulder during several sick call visits. <u>See</u> <u>id.</u> According to plaintiff:

> . . .He would never physically evaluate it [plaintiff's right shoulder], simply relying on the x-ray reports, and would always suggest that Plaintiff was hallucinating, basically stating that nothing was wrong and the problem was in my head.

<u>Id.</u>

Plaintiff claims he developed atrophy due to the lack of treatment and that his pain medications were not working. <u>See</u> <u>id.</u> 11-12. Plaintiff states:

> . . .So Plaintiff continued to present these concerns to Doctor Hirsch who displayed his indifference to my needs by having me charged for these medical visits ($5.00 each) and did not consider them follow-up visits/consultations that would have me exempt from further charge.

<u>Id.</u> at 12.

<u>Allegations Specific to Defendant O'Brien</u>

Plaintiff states he was sent to Corcoran State Prison (Corcoran) "[a]fter another medical visit, this time by Dr. O'Brien." <u>Id.</u> While at Corcoran, plaintiff was sent for an outside consult and had an MRI on October 16, 2002. <u>See</u> <u>id.</u>

<u>Allegations Specific to Defendant Penner</u>

Plaintiff states he arrived at California State Prison – Sacramento (CSP-Sac.) on July 10, 2003, at which time "medical staff was made aware of the shoulder problem and the pain involved and need for treatment." <u>Id.</u> at 14. According to plaintiff, he was seen by defendant Penner in August and then again in September 2003. <u>See</u> <u>id.</u> Plaintiff contends he was told by defendant Penner nothing was wrong with his shoulder but defendant Penner nonetheless ordered x-rays on September 3, 2003. <u>See</u> <u>id.</u> at 14-15.

/ / /

3

<u>Allegations Specific to Defendant Turella</u>

Plaintiff claims defendant Turella was "responsible for the results/diagnostic testing," <u>see</u> CAR 24, pg. 15, apparently referring to the x-rays ordered by defendant Penner in September 2003. Plaintiff alleges defendant Turella deliberately misread the x-rays. <u>See</u> <u>id.</u>

## II. THE PARTIES' EVIDENCE

**A.** **<u>Evidence Offered by Defendants Hirsch, Turella, Kordan, Baughman, and O'Brien</u>**

Defendants Hirsch, Turella, Kordan, Baughman, and O'Brien argue the following facts are not in dispute:

<u>Undisputed Facts Relating to Defendant Hirsch</u>

1. As a primary care doctor, defendant Hirsch saw plaintiff on June 3, 2002, for complaints of constant right shoulder pain. Plaintiff reported he injured his right shoulder in 1999 and has since been taking ibuprofen. Plaintiff also reported he did push-ups, but reported handcuffs were a problem for him.

2. Defendant Hirsch examined plaintiff and noted plaintiff was well-built from obvious exercise. Defendant Hirsch noted no obvious pathology when plaintiff was wearing handcuffs, and noted the most recent x-ray of plaintiff's right shoulder was normal.

3. Defendant Hirsch's medical plan was to obtain a new x-ray of plaintiff's right shoulder to rule out calcium deposits. Dr. Hirsch also prescribed Tylenol.

4. On June 2, 2003, defendant Hirsch approved a soft-shoe chrono for plaintiff to mitigate a bunion on his right foot.

<u>See</u> Doc. 168-11 (Defendant Hirsch's separate statement).

<u>Undisputed Facts Relating to Defendant Turella</u>

1. On September 10, 2003, defendant Turella ordered a right shoulder x-ray in advance of an outside orthopedic consult scheduled for September 15, 2003.

2. A 3-view series of plaintiff's right shoulder was taken on September 11, 2003, and were interpreted as normal by Dr. Alan White.

3. Defendant Turella was not involved with interpretation of the x-rays taken on September 11, 2003.

<u>See</u> Doc. 168-14 (Defendant Turella's separate statement).

## Undisputed Facts Relating to Defendant Kordan

1.      Defendant Kordan's involvement with plaintiff was limited to interpretation of two x-rays taken in December 2001 and June 2002.

2.      On January 2, 2002, defendant Kordan reported on his interpretation of the December 2001 x-rays, concluding they revealed no abnormalities.  Defendant Kordan also opined the x-rays showed no acute chronic, traumatic, or destructive changes, the glenohumeral and acromioclavicular joints were unremarkable, and no soft tissue calcifications.

3.      Defendant Kordan reported on the June 2002 x-rays that same month, on June 19, 2002.  Defendant Kordan reported the same findings as he did for the December 2001 x-rays.

See Doc. 168-12 (Defendant Kordan's separate statement).

## Undisputed Facts Relating to Defendant Baughman

1.      On December 26, 2001, defendant Baughman ordered tests for plaintiff to rule out kidney disease after plaintiff complained about swollen feet, which eventually decreased after salt was discontinued.  Defendant Baughman also ordered x-rays of plaintiff's right shoulder after he complained of right shoulder pain.

2.      X-rays were taken on December 28, 2001, and Defendant Kordan reported on the results.

See Doc. 168-10 (Defendant Baughman's separate statement).

## Undisputed Facts Relating to Defendant O'Brien

1.      As a primary care doctor, defendant O'Brien saw plaintiff on September 9, 2002, in response to plaintiff's complaints of recurrent right shoulder pain.  Defendant O'Brien noted a recent x-ray of plaintiff's right shoulder was normal.

2.      On examination, defendant O'Brien noted plaintiff had reduced range of motion in his right shoulder and assessed possible rotator cuff injury.

3.      To rule out such injury, defendant O'Brien ordered an MRI study of plaintiff's right shoulder.  Defendant O'Brien also ordered a "no exercise" chrono for 60 days and prescribed motrin for ten days.

4.      At his deposition, plaintiff admitted defendant O'Brien provided adequate medical care with respect to ordering an MRI.

See Doc. 168-13 (Defendant O'Brien's separate statement).

/ / /

/ / /

Defendants' statements of undisputed facts are supported by their own declarations, see Docs. 168-3 (Baughman declaration), 168-4 (Hirsch declaration), 168-5 (Kordan declaration), 168-6 (O'Brien declaration), 168-7 (Turella declaration), and the exhibits attached thereto, as well as plaintiff's verified first amended complaint, see Doc. 168-8, Exhibit A, plaintiff's medical records obtained with plaintiff's consent, see id. at Exhibit B, and the transcript of plaintiff's deposition, see id. at Exhibit C.

**B.      Evidence Offered by Defendant Penner**

According to defendant Penner, the following facts are not in dispute:

1.      During the relevant time period, defendant Penner treated plaintiff's right shoulder in August 2003.

2.      During the August 2003 examination, defendant Penner took plaintiffs' blood pressure, recorded his weight, and noted plaintiff was well-nourished, well-developed, and in no acute distress.

3.      Defendant Penner physically examined plaintiff's right shoulder and noted it was slightly tender. Defendant Penner also examined plaintiff's left wrist and left hip in response to his complaints of pain and noted plaintiff's left wrist was slightly tender and his left hip was tender on the left side.

4.      On August 12, 2003 – the same day he examined plaintiff – defendant Penner ordered an orthopedic consult for chronic right shoulder pain, and ordered a 30-day prescription for Motrin 800 for right shoulder pain. Defendant Penner also ordered a hepatitis lab profile, bilateral knee braces, a podiatry consult, and an ace wrap for plaintiff's left wrist.

5.      As a staff physician, defendant Penner was not responsible for scheduling consults with outside providers.

6.      Plaintiff was seen by outside orthopedic specialist, Dr. Fong, on September 15, 2003. Based on Dr. Fong's recommendation, defendant Penner ordered an MRI of plaintiff's right shoulder.

7.      An MRI was conducted on October 17, 2003, and plaintiff was seen by outside specialist Bradley Williams, M.D., for a follow-up consult on December 17, 2003.

See Doc. 155-2 (Defendant Penner's separate statement).

Defendant Penner's statement of undisputed facts is supported by his own declaration and exhibits attached thereto, see Doc. 155-4, and the transcript of plaintiff's deposition, see Doc. 155-3, Exhibit A.

/ / /

C.     **Plaintiff's Evidence Offered in Opposition**

Plaintiff has filed the following in response to defendants' motions:

Doc. 175     "Plaintiff's Response to Defendants Motion for Summary judgment"

Doc. 182     "Addendum to Summary Judgment Response EXHIBIT"

Doc. 183     "Plaintiff's Response to Defendants Motion for Summary Judgment"

Doc. 184     "Plaintiff's Statement of Disputed Factual Issues"

Doc. 186     "Addendum – Plaintiff Anthony Mack's Declaration in Support of Response-Opposition to Defendants Motion for Summary Judgment"

Doc. 189     "Third Addendum to Response to Defendants Motion for Summary Judgment"

Despite the lack of any provision in the Federal Rules of Civil Procedure for more than one opposition to each off the two pending motions for summary judgment, the court has considered each of plaintiff's filings and any exhibits attached thereto.  The court has also considered plaintiff's verified first amended complaint as his declaration, summarized above.

Attached to "Plaintiff's Response to Defendants Motion for Summary judgment" at Doc. 175 is "Plaintiff's Statement of Undisputed Factual Issues -Disputed-" in which plaintiff states the following factual issues are in dispute:

1.     Whether the Plaintiff was seen or treated by Dr. Penner "After" the principle diagnosis was that I had right shoulder impingement.

2.     Whether the Plaintiff was denied effective pain medication by Dr. Penner on repeated occasions.

3.     Whether Dr. Penner's 30-day prescription of Motrin was for Plaintiff's pre-existing hip joint pain, left wrist pain, hallux valous deformity pain, and knee pain, as opposed to right shoulder pain.

4.     Whether Dr. Penner at any time physically examined the Plaintiff's right shoulder or any other body part during any medical visit.

5.     Whether Plaintiff had been assigned to the facility "yard" where Dr. Penner was a primary care provider.

6.     Whether Dr. Penner monitored Plaintiff's condition on different occasions after knowing I was suffering from a serious medical condition.

1    7.    Whether Dr. Penner followed or ignored the
recommendation/order for an EMG test by ortho specialist Dr. Fong.

2

3    8.    Whether Dr. Penner's decision to submit a "routine"
request for an orthopedic consultation on two separate dates a month after
my initial visit rather than "urgent" resulted in unnecessary and wanton
4    infliction of pain while simultaneously questioning ortho-consult and
ortho determination.

5

6    9.    Whether Dr. Penner has a history of deliberate indifference
or a pattern and practice of it.

7    10.    Whether Dr. Penner (he was) deliberately indifferent to the
pain and suffering experienced by Plaintiff.

8

9    11.    Whether a five-and-a-half-year delay in treating me
constitutes deliberate indifference (15 months by Penner).

10    12.    Whether Dr. Penner provided adequate medical care.

11    13.    Whether Dr. Penner's dogged resistence [sic] in course of
treatment known to be ineffective caused unnecessary and wanton
12    infliction of pain and suffering.

13    14.    Whether the medical condition and deprivation was
objectively serious and that the defendants subjectively knew about it and
14    refused to remedy it.

15    15.    Whether Plaintiff's medical needs were serious.

16    16.    Whether the existence of bone spurring is indicative of a
serious underlying injury that causes pain.

17

18    17.    Whether Dr. Penner conducted an upper extremity nerve
test as ordered by way of "Electromyography" A.K.A. EMG.

19    18.    Whether atrophy and muscle cartiledge [sic] disintegration
occurs or sets in from an unrelated/damaged torn rotator cuff (separated
20    shoulder).

21    19.    Whether Ibuprofen is a medically acceptable course of
treatment to cure pain produced by ligament (muscle) damage.

22

23    20.    Whether Dr. Penner employed other preventative measures
or course of treatments to reduce my pain after serious injury diagnosed
and whether bone spurring is painful and a torn rotator cuff (separation in
24    shoulder) is painful.

25    Doc. 175-1.

26    The statement at Doc. 175-1 does not contain any items 21 or 22 and, as with many of the

27    foregoing, items 23 through 25 constitute argument and not a statement of disputed facts.  See id.

28    at pgs. 3-4.

8

Plaintiff also provides his own declaration at Doc. 175, in which he states his appointment with defendant Penner on August 12, 2003, was "more of an interview" to apprise defendant Penner of "chronic ailments and chronic pain." Doc. 175-2, pg. 1. According to plaintiff, he told defendant Penner his current pain medications were ineffective. See id. Plaintiff states defendant Penner "ignored my request for a stronger pain medication for my shoulder." Id. Plaintiff states defendant Penner "looked at" his right shoulder and "asked me to lift it – move it around asking me how does it feel." Id. at 2. Plaintiff states "as a result of the pain" defendant Penner ordered an orthopedic consult. Id.

Plaintiff also states in this declaration the consult referral was "arbitrarily denied" because defendant Penner marked "routine" on the request for services form when ordering the consult. Id. Plaintiff also contends defendant Penner improperly relied on an "old" radiology report. Id. Plaintiff states the consult would have been approved had defendant Penner marked "urgent" or "emergent" on the request form. Id.

Plaintiff next states he saw defendant Penner again on August 27, 2003, at which time plaintiff "asked for reconsideration" and for additional treatment. Id. According to plaintiff, defendant Penner "was uncooperative and argumentative" while concluding nothing was wrong. Id. Plaintiff alleges defendant Penner refused to examine his shoulder, which had no range of motion. See id. Plaintiff claims defendant Penner "refused to increase change or prescribe any pain medication for my shoulder." Id. Plaintiff states he also presented with complaints of hip pain. See id.

Plaintiff states in his declaration he next saw defendant Penner for a follow-up visit on September 3, 2003. See id. According to plaintiff, he complained of ongoing pain but was told by defendant Penner his latest lab test results were normal. See id. Plaintiff claims defendant Penner did not discuss his "other problems." Id.

Plaintiff also states x-rays were taken on September 11, 2003, and that he was seen by outside orthopedic consultant Dr. Fong on September 15, 2003. See id. According to plaintiff, Dr. Fong ordered an MRI and EMG, but defendant Penner "did not follow or adhere to these orders." Id. at 2-3. Plaintiff notes, however, an MRI was taken on October 17, 2003. See

9

Doc. 175-2, pg. 3.

Plaintiff contends defendant Penner remained his primary care physician through 2004 and "continued to deny me or increase or implement a plan to treat my chronic pain during the duration of 2004." Id. Plaintiff states, however, he had surgery on December 27, 2004. See id. Plaintiff states defendant Penner continued to mark "routine" on request for services forms despite defendant Penner's knowledge of the foregoing. Id. According to plaintiff, defendant Penner knew his treatment was inadequate. See id. at 3-4.

Attached as Exhibit A to plaintiff's declaration (Doc 175-2) is a request for services submitted by defendant Penner on May 25, 2004, for an orthopedic follow-up and a request for services submitted by defendant Penner on July 8, 2004, for an orthopedic consultation with Dr. Williams.

Attached as Exhibit A to plaintiff's "Addendum to Summary Judgment Response EXHIBIT" at Doc. 182 is an inmate appeal form CDC 602 submitted by plaintiff on May 15, 2003, outlining claims against defendant O'Brien. See Doc. 182, Exhibit A. Also attached with Exhibit A is the second-level response to this appeal. See id. The second-level response indicates plaintiff's grievance was "Partially Granted" at the first level in that plaintiff would be "followed in yard clinic." Id.

"Plaintiff's Response to Defendants Motion for Summary Judgment" at Doc. 183 consists of points and authorities in support of plaintiff's opposition to defendants' motions. No additional evidence is provided with this filing.

"Plaintiff's Statement of Disputed Factual Issues" at Doc. 184 consists of two additional statements of disputed factual issues as well as another declaration from plaintiff. See Doc. 184. Also provided with this document are a number of exhibits consisting of plaintiff's medical records. See id. at pgs. 17-75 (Exhibits A1, A2, B1, B2, B3, C, D1, D2, E1, E1, F, G, H1, H2, I, J1, J2, K, L, M, N, O, and P). In his declaration entitled "Addendum – Plaintiff Anthony Mack's Declaration in Support of Response-Opposition to Defendants Motion for Summary Judgment" at Doc. 186, plaintiff purports to authenticate the exhibits provided with Doc. 184.

10

In his "Third Addendum to Response to Defendants Motion for Summary Judgment" at Doc. 189, plaintiff provides a further statement of disputed factual issues and another declaration. <u>See</u> Doc. 189. According to plaintiff, defendants Hirsch and O'Brien told him no further treatment for his shoulder would be provided and that plaintiff "must learn to live with (accept) the pain." <u>Id.</u> at 1. Plaintiff also states conservative treatment was recommended but never administered and "no ortho consult." <u>Id.</u> Plaintiff adds: "That standard course of treatment and or evaluation for shoulder injury was not given." <u>Id.</u> Plaintiff contends the following issues are in dispute:

> 1.    Whether the defendants. . .deviated from standard course of treatment applied for shoulder injuries. . . .
>
> 2.    Whether this deviation resulted in unreasonable delay contributing to unnecessary pain and suffering. . . .
>
> <u>Id.</u> at pg. 1.

Plaintiff states defendants Hirsch and O'Brien were his last two primary care doctors and they refused to provide treatment. <u>See id.</u> at 2.

Finally, as noted above, the court has considered plaintiff's verified first amended complaint as his declaration. <u>See</u> Doc. 24.

## III. DISCUSSION

### A.    Defendants' Motions for Summary Judgment

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The standard for summary judgment and summary adjudication is the same. <u>See</u> Fed. R. Civ. P. 56(a), 56(c); <u>see also</u> <u>Mora v. ChemTronics</u>, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). Under summary judgment practice, the

/ / /

1    moving party

2         . . . always bears the initial responsibility of informing the district court of
3         the basis for its motion, and identifying those portions of "the pleadings,
          depositions, answers to interrogatories, and admissions on file, together
4         with the affidavits, if any," which it believes demonstrate the absence of a
          genuine issue of material fact.

5         Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

6         If the moving party meets its initial responsibility, the burden then shifts to the

7    opposing party to establish that a genuine issue as to any material fact actually does exist.  See

8    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

9    establish the existence of this factual dispute, the opposing party may not rely upon the

10   allegations or denials of its pleadings but is required to tender evidence of specific facts in the

11   form of affidavits, and/or admissible discovery material, in support of its contention that the

12   dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The

13   opposing party must demonstrate that the fact in contention is material, i.e., a fact that might

14   affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S.

15   242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th

16   Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

17   return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

18   (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than

19   simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

20   taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no

21   'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the

22   claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions

23   of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

24        In resolving the summary judgment motion, the court examines the pleadings,

25   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.

26   See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson,

27   477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the

28   court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.

Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251.

Plaintiff claims defendants, who are prison doctors, violated his Eighth Amendment right to medical care. The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment. See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976). Conditions of confinement may, however, be harsh and restrictive. See Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm. See Farmer, 511 U.S. at 834. Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind." See id.

Deliberate indifference to a prisoner's serious illness or injury, or risks of serious injury or illness, gives rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 105; see also Farmer, 511 U.S. at 837. This applies to physical as well as dental and mental health needs. See Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982). An injury or illness is sufficiently serious if the failure to treat a prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton infliction of pain." McGuckin v. Smith, 974 F.2d

1050, 1059 (9th Cir. 1992); see also Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). Factors indicating seriousness are: (1) whether a reasonable doctor would think that the condition is worthy of comment; (2) whether the condition significantly impacts the prisoner's daily activities; and (3) whether the condition is chronic and accompanied by substantial pain. See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th Cir. 2000) (en banc).

The requirement of deliberate indifference is less stringent in medical needs cases than in other Eighth Amendment contexts because the responsibility to provide inmates with medical care does not generally conflict with competing penological concerns. See McGuckin, 974 F.2d at 1060. Thus, deference need not be given to the judgment of prison officials as to decisions concerning medical needs. See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989). The complete denial of medical attention may constitute deliberate indifference. See Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir. 1986). Delay in providing medical treatment, or interference with medical treatment, may also constitute deliberate indifference. See Lopez, 203 F.3d at 1131. Where delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury. See McGuckin, 974 F.2d at 1060.

Negligence in diagnosing or treating a medical condition does not, however, give rise to a claim under the Eighth Amendment. See Estelle, 429 U.S. at 106. Moreover, a difference of opinion between the prisoner and medical providers concerning the appropriate course of treatment does not give rise to an Eighth Amendment claim. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

Defendants Hirsch, Turella, Kordan, Baughman, and O'Brien argue:

Mr. Mack's claims of deliberate indifference are beyond meritless. They are in bad faith. The evidence shows that, to the extent they had any involvement with his claimed shoulder problem, moving defendants treated Mr. Mack professionally, compentently [sic], and with a genuine desire to help him. Mr. Mack has, in his turn, created a massive waste of paper, attorney time, and court time on this frivolous lawsuit. The court should therefore end this nonsense now by granting summary judgment to defendants. . . .

/ / /

/ / /

14

In his separate motion for summary judgment, defendant Penner argues:

> The medical care Dr. Penner provided Mack does not exhibit deliberate indifference to his serious medical needs. While Mack wanted stronger pain medication, a difference of opinion is not enough to establish an Eighth Amendment claim. Thus, Dr. Penner is entitled to summary judgment.

Defendant Penner also argues he is entitled to qualified immunity.

        1.    <u>Defendants Hirsch and O'Brien</u>

Plaintiff claims defendant Hirsch violated his Eighth Amendment rights by refusing to examine his right shoulder and refusing to prescribe stronger pain medications. <u>See</u> Doc. 24, pgs. 11-12. Plaintiff's allegations against defendant O'Brien are extremely limited. In particular, plaintiff states he was sent to Corcoran State Prison "[a]fter another medical visit, this time by Dr. O'Brien." <u>Id.</u> at 12.

As to defendant Hirsch, defendants argue:

> It is clear from Mr. Mack's medical history that Dr. Hirsch was not deliberately indifferent to any shoulder condition. Dr. Hirsch only saw Mr. Mack one time for that condition. At that time, the only evidence of any shoulder pathology was Mr. Mack's claim of pain. That claim was belied by Dr. Hirsch's physical examination which found Mr. Mack to be very well built physically, indicating that he worked out. Mr. Mack admitted to doing push-ups. Though he claimed that the shoulder was aggrevated [sic] by handcuffs, this was not apparent to Dr. Hirsch during the examination. Moreover, Mr. Mack's previous X-rays of the joint were normal. What was clear was Mr. Mack's bad attitude and his threats of lawsuits. In spite of that, Dr. Hirsch ordered additional X-rays of the shoulder to assure that nothing was amiss and prescribed a painkiller for Mr. Mack. All of Dr. Hirsch's actions were within professional standards and were done in a sincere effort to help Mr. Mack, not to hurt him. None of these actions demonstrates the deliberate indifference necessary for an Eighth Amendment violation.
>
> Even if Dr. Hirsch was involved in a decision at some level on a 602 grievance by Mr. Mack, that would not be grounds for liability under section 1983. . . . [T]here is no constitutional right implicated in a prison grievance process. Moreover, Mr. Mack's medical history at CCI does not show any obvious medical chicanery by others for Dr. Hirsch to have deliberately ignored in a grievance decision, if any there was. Mr. Mack did not exhibit or disclose any shoulder injury when he entered CCI nor were there any diagnostic findings up to the time Dr. Hirsch saw him, to indicate any serious shoulder pathology.
>
> Dr. Hirsch treated Mr. Mack in good faith and within professional standards. Accordingly, this court should grant him summary judgment, as he never violated Mr. Mack's Eighth Amendment rights.

///

15

The court agrees.  To the extent plaintiff believes defendant Hirsch should have provided stronger pain medications, claims based on a difference of medical opinion do not give rise to liability under § 1983.  See Jackson, 90 F.3d at 332.  As to plaintiff's claim defendant Hirsch was deliberately indifferent by refusing to examine his right shoulder, the evidence shows otherwise.  Based on recollection refreshed by plaintiff's medical records, defendant Hirsch stated in his declaration he examined plaintiff on June 3, 2002, at which time defendant Hirsh ordered additional diagnostic testing even though current imaging revealed a normal right shoulder.  Defendant Hirsch also prescribed Tylenol.  Because plaintiff cannot establish the necessary element of deliberate in difference, defendant Hirsch is entitled to judgment as a matter of law.

As to defendant O'Brien, defendants argue:

> Dr. O'Brien clearly has no liability to Mr. Mack under section 1983. He only saw Mr. Mack a single time for a shoulder condition. At that time Dr. O'Brien ordered an MRI of the shoulder, provided Mr. Mack a prescription for pain medication and also ordered that Mr. Mack refrain from exercise for 60 days. Mr. Mack concedes that this treatment was proper and did not violate his Eighth Amendment rights, but has nonetheless sued Dr. O'Brien. Mr. Mack is perhaps piqued at Dr. Centino, the radiologist, who found no evidence of injury on the MRI. However, he dismissed Dr. Centino from the lawsuit and continues to press for damages against Dr. O'Brien, who properly ordered the study and did not interpret it.
>
> Mr. Mack admits that Dr. O'Brien's treatment did not violate his Eighth Amendment rights. His lawsuit against Dr. O'Brien is thus not only devoid of merit but is clearly in violation of Federal Rule of Civil Procedure, Rule 11. This court should therefore promptly conclude this legal travesty as to Dr. O'Brien and grant him summary judgment.

Regarding defendant O'Brien, plaintiff testified as follows at his deposition:

> Q:    And isn't it true that Dr. O'Brien is the one who ordered an MRI for you?
>
> A:    He is the one that ordered it.
>
> Q:    Now you're not claiming that violated your constitutional rights, are you?
>
> A:    No, that was something he was supposed to do, though, because he was trying – that was part of the treatment, try to find out, okay, let's – that was part of a level of care that's required.  Yeah, let's try to find out what's wrong with this guy's shoulder, he keep complaining,

*/ / /*

16

he's in pain, let's get an MRI done. So there he wasn't at fault. He was –
he was doing what he was supposed to be doing at that time.

CAR 168-8, Exhibit C (transcript of plaintiff's May 1, 2009, deposition).

Given plaintiff's limited allegations in the first amended complaint as to defendant O'Brien, given the foregoing deposition testimony, and given the undisputed evidence showing defendant O'Brien examined plaintiff on September 9, 2002, in response to plaintiff's complaints of recurrent right shoulder pain, prescribed medication, and ordered an MRI, the court finds plaintiff cannot establish defendant O'Brien was deliberately indifferent.

In his responses to defendants' motions, plaintiff provided specific statements of disputed factual issues with respect to defendants Penner, Hirsh, and O'Brien only.[3] As to defendants Hirsch and O'Brien, plaintiff contends defendants told him no further treatment for his shoulder would be provided and that plaintiff "must learn to live with (accept) the pain." Doc. 189, pg. 1. Plaintiff also states conservative treatment was recommended but never administered and "no ortho consult." Id. Plaintiff adds: "That standard course of treatment and or evaluation for shoulder injury was not given." Id. Plaintiff contends the following issues are in dispute:

> 1.    Whether the defendants. . .deviated from standard course of treatment applied for shoulder injuries. . . .

> 2.    Whether this deviation resulted in unreasonable delay contributing to unnecessary pain and suffering. . . .

Id. at pg. 1.

Plaintiff states defendants Hirsch and O'Brien were his last two primary care doctors and they refused to provide treatment. See id. at 2.

Plaintiff's response regarding defendants Hirsch and O'Brien does not change the court's conclusion these defendants are entitled to judgment as a matter of law. Specifically, plaintiff has not provided any evidence to create a genuine dispute as to a material fact. To the extent plaintiff was told no further treatment would be provided, such statements reflect the doctors' opinion based on their observations and the medical record showing no significant

---

[3]    Plaintiff's responses regarding defendant Penner are discussed below.

17

problems with plaintiff's right shoulder. Plaintiff's disagreement with these medical opinions does not rise to the level of an actionable Eighth Amendment violation. See Jackson, 90 F.3d at 332. To the extent plaintiff claims these defendants failed to follow a "standard course of treatment," such a claim at best supports a state law negligence action. The undisputed evidence establishes Defendants Hirsch and O'Brien provided treatment in response to plaintiff's complaints, including examinations and ordering further diagnostic testing. Because defendants provided treatment, plaintiff cannot establish they were deliberately indifferent to his serious medical needs.

### 2. Defendant Turella

Plaintiff claims defendant Turella deliberately misread x-rays. See CAR 24, pg. 15. As to defendant Turella, defendants argue:

> Dr. Turella's only involvement in treatment of Mr. Mack's shoulder condition was to order an X-ray of the shoulder in advance of an appointment scheduled with an orthopedic specialist for September 15, 2003. There is no evidence that Dr. Turella ever even saw Mr. Mack. He was just assuring that Mr. Mack had an X-ray of the shoulder to bring with him to the orthopedic consult. Such an action displays, if anything, professional diligence, not deliberate indifference. The X-ray was promptly both taken and interpreted by an independent, private radiological firm. The outside radiologist-consultant saw no evidence of injury or any serious medical condition in the shoulder. Dr. Turella, who is not a radiologist, had nothing to do with establishing those findings.
>
> Nonetheless, Mr. Mack has hailed Dr. Turella into court, claiming that the radiological finding of a normal shoulder that Dr. Turella had nothing to do with, caused Mr. Mack to be deprived of his consult with an orthopedic specialist. However, that claim is demolished by the clear evidence in Mr. Mack's medical chart that he saw the orthopedist, Dr. Fong, on September 15, 2003 as scheduled.
>
> Mr. Mack's lawsuit against Dr. Turella does nothing more than demonstrate the old adage that "no good deed goes unpunished." In this case, Mr. Mack has rewarded Dr. Turella for his diligence by unjustifiably suing him for damages. Dr. Turella did nothing that could be characterized as an Eighth Amendment violation. The only deliberate indifference here is on the part of Mr. Mack toward Rule 11 of the Federal Rules of Civil Procedure. This court should therefore grant summary judgment to Dr. Turella.

The court agrees defendant Turella is also entitled to judgment as a matter of law. The undisputed evidence shows defendant Turella examined plaintiff on September 10, 2003, and ordered an x-ray and outside consult. The evidence also establishes an x-ray was taken on September 11, 2003, and the results were interpreted by specialist, Dr. Alan White. Defendant

18

Turella was not involved in interpretation of plaintiff's x-rays. On this record, plaintiff simply cannot establish defendant Turella was deliberately indifferent with regard to plaintiff's shoulder condition. Plaintiff has provided no response specific to defendant Turella.

### 3. Defendants Kordan and Baughman

Plaintiff claims defendant Baughman ordered x-rays on December 28, 2001, <u>see</u> Doc. 24, pg. 10, but that the results were deliberately misread and mischaracterized by defendant Kordan, <u>see id.</u> Plaintiff also contends defendant Kordan misread x-rays taken on June 7, 2002. <u>See id.</u> at 11. According to defendants:

> Dr. Kordan's only involvement in Mr. Mack's treatment was to provide a radiologist's report concerning shoulder X-rays on two occasions. His analysis that Mr. Mack's shoulder was normal was made in good faith and was within professional standards. Mr. Mack has no evidence to contradict either the accuracy of Dr. Kordan's reports or Dr. Kordan's good will. There is simply no evidence that Dr. Kordan was deliberately indifferent. As he lacked the requisite mental state for an Eighth Amendment violation, this court should grant Dr. Kordan summary judgment.

Defendants also argue:

> The undisputed facts show that Dr. Baughman treated Mr. Mack in good faith on the single occasion that he saw Mr. Mack for his claimed shoulder condition. Those facts are devoid of any showing of the "sufficiently culpable state of mind" necessary for Mr. Mack to prove a violation of his Eighth Amendment rights. Mr. Mack's primary complaint was a foot condition. As to his secondary complaint of ongoing right shoulder pain, Dr. Baughman appropriately addressed that by ordering an X-ray, which was done two days later. Dr. Baughman, who is a primary care physician, not a radiologist, did not interpret that study and had no other involvement in Mr. Mack's care concerning his shoulder. Moreover, the report, by Dr. Kordan, was that the shoulder was normal. Thus, under the circumstances, there is no evidence of any serious medical need concerning Mr. Mack's shoulder. Moreover, Dr. Baughman's treatment was within community standards and was obviously done in an effort to see if Mr. Mack did have a serious underlying problem.
> There is no evidence that, at the time Dr. Baughman saw him, there was any serious medical condition of Mr. Mack's shoulder or that Dr. Baughman was deliberately indifferent to it. This court should therefore grant Dr. Baughman summary judgment because, as a matter of law, there was no violation of Mr. Mack's Eighth Amendment rights.

/ / /

/ / /

/ / /

19

The evidence provided by defendants shows defendant Baughman's involvement in the case was limited to an examination of plaintiff in December 2001 at which time defendant Baughman ordered additional x-rays of plaintiff's right shoulder. As to defendant Kordan, there is no evidence to support plaintiff's claim he intentionally misread or mischaracterized objective diagnostic testing data. The court finds defendants Baughman and Kordan are entitled to judgment as a matter of law. Again, plaintiff provides no response specific to defendants Baughman or Kordan.

4. Defendant Penner

Plaintiff alleges he was seen by defendant Penner in August and September 2003, shortly after arriving at CSP-Sac. on July 10, 2003. See CAR 24, pg. 14. According to plaintiff, he was told by defendant Penner nothing was wrong with his shoulder but defendant Penner nonetheless ordered x-rays on September 3, 2003. See id. at 14-15. To the extent plaintiff claims defendant Penner was deliberately indifferent to his shoulder condition, the court finds the undisputed evidence establishes otherwise. Specifically, the evidence shows defendant Penner examined plaintiff in response to his complaints, prescribed pain medication, and ordered diagnostic studies as well as an outside consultation with a specialist. Because plaintiff cannot establish deliberate indifference, defendant Penner is entitled to summary judgment in his favor.

As outlined above, plaintiff has provided a response specific to defendant Penner's motion, specifically his filing at Doc. 175 consisting of plaintiff's statement of disputed facts (Doc. 175-1) and plaintiff's declaration (Doc. 175-2). In his declaration, plaintiff states:

1. His August 12, 2003, appointment with defendant Penner was "more of an interview" than an examination.

2. Plaintiff told defendant Penner at this appointment his current pain medications were ineffective.

3. At the appointment, defendant Penner "looked at" plaintiff's right shoulder, asked plaintiff to move it around, and asked plaintiff how his shoulder felt when doing so.

4. According to plaintiff, defendant Penner "ignored my request for a stronger pain medication for my shoulder."

5. Defendant Penner ordered an orthopedic consult due to plaintiff's persistent complaints of pain.

6. The orthopedic consult was "arbitrarily denied," though plaintiff does not state by whom.

7. Defendant Penner improperly relied on old diagnostic studies.

8. Defendant Penner was "uncooperative and argumentative" at an appointment on August 27, 2003.

9. Plaintiff claims defendant Penner refused to examine his right shoulder at this appointment and refused to increase or change his pain medications.

10. X-rays were taken on September 11, 2003, and plaintiff was seen by an outside orthopedic specialist, Dr. Fong, on September 15, 2003.

11. Plaintiff claims Dr. Fong ordered an MRI but that defendant Penner "did not follow or adhere to these orders."

12. An MRI was taken on October 17, 2003, pursuant to Dr. Fong's recommendation.

13. Throughout 2004, defendant Penner was plaintiff's primary care physician but defendant Penner "continued to deny me or increase or implement a plan to treat my chronic pain during the duration of 2004."

14. Plaintiff states he underwent surgery in December 2004.

See Doc. 175-2.

Attached to plaintiff's declaration as Exhibit A is a request for services submitted by defendant Penner on May 25, 2004, for an orthopedic follow-up and a request for services submitted by defendant Penner on July 8, 2004, for an orthopedic consultation with Dr. Williams.

Plaintiff's declaration and exhibits do not change the court's conclusion with respect to defendant Penner. To the contrary, the court notes plaintiff's statements and evidence are somewhat contradictory and ultimately support defendant Penner's version of events. Specifically, while plaintiff claims defendant Penner did not examine his right shoulder on August 12, 2003, plaintiff also states defendant Penner had plaintiff move his shoulder around and asked plaintiff about any pain associated with those movements. Further, while plaintiff states defendant Penner arbitrarily denied a consult, plaintiff's own evidence shows plaintiff was seen by an outside specialist – Dr. Fong – on September 15, 2003. Plaintiff's evidence also shows defendant Penner ordered consults on May 25, 2004, and again on July 8, 2004. Plaintiff's

contention defendant Penner did not examine his right shoulder on August 27, 2003, is belied by plaintiff's medical records and plaintiff's own statements indicating defendant Penner ordered further diagnostic testing and outside consultations. Similarly, plaintiff's statement defendant Penner failed to adhere to Dr. Fong's recommendation for an MRI study is belied by his statement an MRI was taken on October 17, 2003, pursuant to Dr. Fong's recommendation. Finally, while plaintiff states defendant Penner denied him primary care throughout 2004, plaintiff states he underwent surgery in December 2004.

The court also finds defendant Penner is entitled to qualified immunity. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In general, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In ruling upon the issue of qualified immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the defendant's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If a violation can be made out, the next step is to ask whether the right was clearly established. See id. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition. . . ." Id. "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (citation omitted). Thus, the final step in the analysis is to determine whether a reasonable officer in similar circumstances would have thought his conduct violated the alleged right. See id. at 205.

When identifying the right allegedly violated, the court must define the right more narrowly than the constitutional provision guaranteeing the right, but more broadly than the factual circumstances surrounding the alleged violation. See Kelly v. Borg, 60 F.3d 664, 667 (9th Cir. 1995). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand [that] what [the official] is doing violates the

right." See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the court

concludes that a right was clearly established, an officer is not entitled to qualified immunity

because a reasonably competent public official is charged with knowing the law governing his

conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even if the plaintiff

has alleged a violation of a clearly established right, the government official is entitled to

qualified immunity if he could have ". . . reasonably but mistakenly believed that his . . . conduct

did not violate the right."  Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001); see

also Saucier, 533 U.S. at 205.

       The first factors in the qualified immunity analysis involve purely legal questions.

See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a legal

determination based on a prior factual finding as to the reasonableness of the government

official's conduct.  See Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  The district court

has discretion to determine which of the Saucier factors to analyze first.  See Pearson v. Callahan,

555 U.S. 223, 236 (2009).  In resolving these issues, the court must view the evidence in the light

most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff.  Martinez

v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

       Assuming the facts alleged by plaintiff, when viewed in the light most favorable to

plaintiff, show defendant Penner violated plaintiff's Eighth Amendment rights, the undisputed

evidence discussed above establishes defendant Penner was in fact not deliberately indifferent to

plaintiff's serious medical needs.  Thus, defendant Penner not only reasonably but correctly

concluded his conduct did not violate the law and he is entitled to qualified immunity.

    **B.**    **Service of Process on Defendant Hill**

       Service of process directed to defendant Hill was returned unexecuted on March

12, 2010.  See Doc. 190.  The court addressed service of process on defendant Hill in an order

issued on August 28, 2018, as follows:

> . . . According to the return, service on defendant Hill was
> attempted at the address plaintiff provided, but was refused. It appears that
> the US Marshal sent defendant Hill a waiver of service on July 31, 2009.
> After no waiver was return, personal service was attempted on March 3,
> 2010. However, when the US Marshal went to the address indicated, they

were directed to another office in which to serve office employees. When the US Marshal went to the secondary address, they were advised by staff counsel that the office could not receive the process as it did not involve Health Care Services and Health Care Services was not a party. They were told Elaine Hill would have to be served directly, but not at work due to state policy. It appears to the court that defendant Hill has insulated herself from the plaintiff being able to effect service. There is no indication in the return of service that the address plaintiff provided was not an adequate address as to where defendant Hill could be located. As such, the court will request the Office of the Attorney General (to determine) if they have any information as to how best to accomplish service of defendant Hill, or whether they are willing to accept service on her behalf in order to keep this case moving forward.

Doc. 217 (August 28, 2018, order).

Deputy Attorney General Matthew Roman, Esq., responded on September 13, 2018. See Doc. 220. The record reflects plaintiff was served with a copy of Mr. Roman's response. See id. Mr. Roman stated he reviewed his files and could find no contact information for Ms. Hill. See id. at pg. 2. He also stated he was informed by the litigation support unit that Ms. Hill retired in 2011 and no contact information was on file. See id. Mr. Roman did not state he would be willing to waive service. See id. To date, plaintiff has made no efforts to complete service of process on defendant Hill, who should be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m).[4]

C. **Plaintiff's Motion for Injunctive Relief**

Plaintiff seeks a temporary restraining order against the California Attorney General's Office to prevent what he says are retaliatory efforts to violate his right to petition the government for redress. See Doc. 223. The legal principles applicable to requests for injunctive relief, such as a temporary restraining order or preliminary injunction, are well established. To prevail, the moving party must show that irreparable injury is likely in the absence of an injunction. See Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing Winter v. Natural Res. Def. Council, Inc., 129 S.Ct. 365 (2008)). To the extent prior Ninth Circuit cases suggest a lesser standard by focusing solely on the possibility of irreparable harm, such cases are "no longer controlling, or even viable." Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559

_____

[4]     These findings and recommendations served on plaintiff constitute notice and an opportunity to respond required under the rules.

24

F.3d 1046, 1052 (9th Cir. 2009). Under <u>Winter</u>, the proper test requires a party to demonstrate: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships tips in his favor; and (4) an injunction is in the public interest. <u>See</u> <u>Stormans</u>, 586 F.3d at 1127 (citing <u>Winter</u>, 129 S.Ct. at 374). The court cannot, however, issue an order against individuals who are not parties to the action. <u>See</u> <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 395 U.S. 100, 112 (1969). Moreover, if an inmate is seeking injunctive relief with respect to conditions of confinement, the prisoner's transfer to another prison renders the request for injunctive relief moot, unless there is some evidence of an expectation of being transferred back. <u>See</u> <u>Prieser v. Newkirk</u>, 422 U.S. 395, 402-03 (1975); <u>Johnson v. Moore</u>, 948 F.3d 517, 519 (9th Cir. 1991) (per curiam).

In his motion for injunctive relief, plaintiff complains of alleged retaliatory conduct, including confiscation of his legal materials, deprivation of basic standards of living, and coercive placement on suicide watch. <u>See</u> Doc. 223. The court finds injunctive relief is not warranted for several reasons. First, the current action does not involve any claims of retaliation, denial of access to the courts, denial of the basic standards of living (other than adequate medical care), or coercive placement on suicide watch. Further, for the reasons discussed above, the court concludes plaintiff has no chance of success on the merits of his Eighth Amendment medical care claims against defendants Hirsch, Turella, Kordan, Baughman, O'Brien, or Penner, and defendant Hill should be dismissed for failure to prosecute. Therefore, on any issues raised in either the operative complaint or plaintiff's motion for injunctive relief, plaintiff cannot demonstrate any chance of success on the merits in the context of the current action. Second, plaintiff has not linked the allegations outlined in his motion for injunctive relief to any defendant to this action. As such, the court lacks jurisdiction to issue the requested order. Finally, plaintiff has not demonstrated how he is likely to suffer any injury, let alone irreparable injury.

/ / /

/ / /

/ / /

/ / /

# IV. CONCLUSION

Based on the foregoing, the undersigned recommends that:

1.     Defendant Hill be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m) for failure to effect service of process;

2.     Defendants' motions for summary judgment (Docs. 155 and 168) be granted;

3.     Plaintiff's motion for injunctive relief (Doc. 223) be denied; and

4.     The Clerk of the Court be directed to enter judgment in favor of defendants and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


Dated:  January 31, 2019

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE